UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
ELISA BARTONE,

                             Plaintiff,                                    Docket #

       - against -                                                         **COMPLAINT**

                                                                           **JURY DEMANDED**

ERICA MATTERA, BARBARA NEIS, AND NEW
YORK CITY DEPARTMENT OF EDUCATION

                             Defendants.
-------------------------------------------------------------------x

       The plaintiff, by her attorneys, The Behrins Law Firm, PLLC, complaining of the

defendants, alleges as follows:

**NATURE OF ACTION & PARTIES**

       1.      This is an action arising under the Americans with Disabilities Act, 42 U.S.C.

Section12181, *et seq.*, and the Fourteenth Amendment as it relates to the First Amendment, the

New York State Executive Law (Human Rights Law) Section 290, *et seq.,* Chapter I, Title 8 of the

Administrative Code of the City of New York, Section 8-107(1)(a) (referred to as the Human

Rights Law of the City of New York), New York Labor Law Section 740 (Retaliatory personnel

action by employers), asserting claims for violations of the foregoing statutes and retaliation for

complaining thereof against the defendants, and for workplace harassment.

       2.      That the plaintiff, ELISA BARTONE, at all relevant times herein, was and is a

resident of the State of New York, County of Richmond.

       3.      That the plaintiff, ELISA BARTONE, was employed by defendant Department of

Education since 1995.

**JURISDICTION AND VENUE**

4.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331, 28 U.S.C. Section 1367, and principles of pendent jurisdiction in that the city, state, and federal law claims arise from a common nucleus of operative facts.

5.      Plaintiff ELISA BARTONE filed a charge of discrimination with the United States Equal Employment Opportunity Commission (hereinafter referred to as "EEOC") on or about March 25, 2015.

6.      On or about August 31, 2015, the EEOC issued a notice informing the plaintiff of her right to sue.

7.      Plaintiff has complied fully with all prerequisites to jurisdiction in this Court under the Americans with Disabilities Act.

8.      As the unlawful employment practices complained of herein occurred within the New York Judicial District, venue is proper in this District.

**FACTS AND ALLEGATIONS COMMON TO ALL COUNTS**

9.      The plaintiff began employment with the New York City Department of Education (hereinafter referred to as "DOE") at P.S. 11 in 1995. The plaintiff enjoyed an excellent record throughout her employment and was granted tenure with a special written mention of the quality of her character and professionalism by the then principal.

10.     Beginning on or around the middle of 2007 and continuing to the present, the plaintiff has been the target of vindictive and vicious abuse, bullying, and harassment, and has been subject to an extremely hostile work environment due to the actions of the Principal of P.S. 11, Erica Mattera and Assistant Principal, Barbara Neis.

2

11.     In December 2006, the plaintiff demonstrated "Readers' Theater" while being formally observed by Mattera. Mattera was so impressed by the plaintiff's demonstration, she proclaimed "That was excellent!" before leaving to write her glowing report about the plaintiff.

12.     In May 2007, P.S. 11 unfortunately received a failing grade of "F." This placed Mattera in a probationary period as the principal. As one would expect, she wanted to improve the school's rating in an effort to conclude her probationary period. Having been so impressed by the quality of the plaintiff's Readers' Theater demonstration, Mattera created a position of "cluster teacher" in a new program called "Readers' Theater." Mattera did so with the plaintiff in mind as the teacher to run it.

13.     Much to the dismay of Mattera, the plaintiff politely declined the new position as she was very happy with teaching first grade and had no desire to make a change. Despite making it very clear to Mattera that she was not interested, Mattera was persistent and aggressive in trying to persuade the plaintiff. In May 2007, Mattera said to the plaintiff, "You have to take [this position] because you are the only one who could help raise the school's test scores and prevent me from losing my job." Mattera's persistence and aggression slowly morphed into begging and desperation as the plaintiff continued to decline the position. The plaintiff cared about the school and (at the time) Mattera so she offered to assist the teacher that would eventually take the position. This was not enough for Mattera as she continued her efforts to convince the plaintiff to take the job. It is important to note how persistent Mattera really was in recruiting the plaintiff for this job as it speaks to how highly regarded the plaintiff was as a teacher.

14.     It was after the above occurred that Mattera's demeanor started to change from seeking the plaintiff to help the school and her to subtle threats and attempting to strong arm the plaintiff into capitulating. Mattera indicated that if the plaintiff refused the position, there "… was

going to be a reorganization [of the teaching positions]." This created a very real risk that the plaintiff would be removed from her teaching position for first graders.

15.     Approximately one week later, the plaintiff was again pressured to meet with Mattera about the position. Yet again, she clearly and decisively declined the position. Mattera went to the lengths of giving the plaintiff the copy of the cluster teacher job she was about to post, said that she had tailored it to the plaintiff, that she couldn't see anybody else doing the job, and that no one could do what the plaintiff can do. Indeed, Mattera wanted to place as many students in the school as she could with the plaintiff. The very same thoughts were buttressed in Mattera's own written "posting points" for the position.

16.     There was a June 8 deadline to apply for the position. On June 6, 2007, Mattera made one last ditch effort to convince the plaintiff to accept. For the umpteenth time, the plaintiff politely declined. She wanted to definitively and finally decline the position so as to leave little doubt that she was not interested. This was the proverbial "straw that broke the camel's back" for Mattera. It was finally clear to her that the plaintiff would not be accepting the position. In reaction, Mattera completely turned on the plaintiff, the same teacher who put on a demonstration so impressive that Mattera created a new program based entirely on the plaintiff's performance. At the June 6, 2007 meeting, Mattera raised a pretextual "issue" she had with the plaintiff. It was alleged that a parent was "livid" because her child had wet herself when she returned home from school one day. Mattera said that the plaintiff shouldn't be surprised if there was an investigation about the matter and she gets a summons regarding it. The plaintiff was never shown any complaint that Mattera referred to and was subsequently told by the then PTA president that the only complaints to the DOE were about Mattera, and that there were many.

17.     Mattera, realizing she had made a mistake, directed the plaintiff to not talk to parents or the Union about what she had said or she "can't take care of it." The plaintiff, feeling threatened and intimidated by Mattera at the time, did not have the vision to realize Mattera was trying to leverage the situation against the plaintiff, as Mattera was likely the subject of complaints. At the end of the deadline day, June 8, the subject student was removed from the plaintiff's dismissal line by the then coach, Barbara Neis, and taken to Mattera.

18.     True to her word, in June 2007, there was in fact a reorganization of the teaching positions and the plaintiff was listed as a second grade teacher for the first time in her then 12 year career. On that very same day, the plaintiff received a summons stating she was being investigated for "corporal punishment." This was the first summons the plaintiff had ever received. The plaintiff immediately reported the summons to the UFT and the UFT representative from the borough office stated that there was a link between the plaintiff's refusal to accept the Readers' Theater position and the summons. On June 26, 2007, the plaintiff received a letter from Mattera stating that the allegation had been unsubstantiated.

19.     The plaintiff received an "S" rating[1] for the 2007-2008 school year, as she had every year of her career…until the following the year. At the conclusion of the 2008-2009 school year, the plaintiff received her first ever "U" rating (which she is *still* in the process of challenging). 2008 was also the first year of Adam Baskin's tenure as assistant principal at P.S. 11. It is important to note that 2008-2009 was the first of Baskin's three years of probation. It is also important to note that Baskin was the only reasonable and understanding person in the school administration, but due to his probationary status, any activity that would be perceived as contrary to the administration would jeopardize his position. Baskin understood the overall corrupt nature of the

---

[1] Teachers are given either an "S" rating for "Satisfactory" or a "U" rating for "Unsatisfactory"

DOE and knew that if he wanted to survive within the system, he had to look the other way on many situations.

20.     On October 14, 2010, the plaintiff had a conversation with Adam Baskin. During the conversation, Baskin told the plaintiff that Mattera would have fired him for coming to the plaintiff's defense regarding the 2009 "U" rating. Baskin did not agree with the corrupt actions of Mattera and the administration, but was not willing to sacrifice his job and put his family at risk for the plaintiff. He stated he knew from being a former UFT representative that the entire system is rife with fraud and the DOE always backs the principal, who always wins. His position was that even if he came to the plaintiff's defense, it would be for naught and the only change it would perpetrate would be career ending. He referred to Mattera and Neis as "malicious lunatics" and named Neis as the main cause of the "U" rating. Baskin shared the plaintiff's fear of coming to work every day as he did not know what Mattera would do next. He told the plaintiff he had recorded instances of verbal abuse by Mattera and Neis and had played the recordings for certain of his superiors at the DOE and that would prevent Mattera from ever being promoted.

21.     On February 8, 2011, Baskin stated he would be "water boarded" for talking to the plaintiff. He further told the plaintiff that Mattera used language with him that he would not repeat and that he wanted to help the plaintiff, a good person and a great teacher, get out of a bad situation. He confirmed that the plaintiff was being "lied about" and that Neis would be the Assistant Principal the following year, regardless of the protocol and procedures and advised the plaintiff to "get out because things would get even worse."  He again shared with the plaintiff that he was subjected to the same abuse from the day that he got there and repeated that people at high levels of the DOE were aware of Mattera's behavior.  Those aware have done nothing about it, only further evidencing the institution wide level of corruption at the DOE.

22.     On February 10, 2011, the plaintiff had another conversation with Baskin. He told her that Mattera was very angry at the positive report he had given based on his observation of the plaintiff's February 8 class and Mattera ordered him to "make it negative." He provided the plaintiff with a copy of the written report had originally intended to submit. He also said that he could not comment on the plaintiff's 2008-2009 "U" rating because it would incriminate himself. He stated that the things he knew and could say about what was going on would go a long way toward discrediting the "U" rating and the attachments to it.

23.     On March 9, 2011, Baskin handed the plaintiff a "substantiated" letter from Mattera stemming from a pretextual verbal abuse allegation that was to be the centerpiece of the predetermined "U" rating that Mattera intended to give the plaintiff for the school year. BaSkin said that he knew that the plaintiff did not abuse anyone and that he was "being asked to do a lot of things that weren't right, that [his] union was preparing a harassment complaint against Mattera and that [the plaintiff's] union should do the same for [her]." They agreed that they were both in the same situation with the differentiating factor being that he, as the plaintiff's supervisor and knowing that she was being harassed, was obligated to help her. Additionally, the plaintiff was asking him to help her as, again, he was the only person even remotely willing to do something about the institution wide corruption at the DOE. He unfortunately refused based on the fact that doing so would cost him his job. Later in the school year, Baskin told the plaintiff that he had been promised a job if he does nothing now. Clearly, Baskin was bribed to stay quiet regarding very serious corruption and fraud allegations against Mattera. The mere fact that Baskin knew he could not go over Mattera's head is a undeniable indicator of how widespread the corruption is at the DOE.

24.     On May 16, 2011, Baskin observed the plaintiff's reading lesson. His verbal report was very positive and he stated that the plaintiff would receive a similarly positive written report. On May 18, 2011, Baskin told the plaintiff that Mattera ordered him to give a negative report and include a recommendation that the plaintiff work with Mattera's accomplice, Barbara Neis, purportedly to improve her teaching. In the plaintiff's 12 years of teaching prior to the 2007 refusal to accept a new position, she had not a single blemish on her record. Her ratings were 100% "S." Her reports were all positive. She had never received a summons nor had a complaint ever been leveled against her. Yet all of a sudden, if one were to believe Mattera, the plaintiff needed to work on her teaching skills. Baskin put it best when he referred to the school as an "insane asylum." He confidently stated that the plaintiff was better than most teachers (not just at the school, but in general) and that she has a special gift. Enough was finally enough for Baskin in May 2011 as he wrote to Emil Pietromonaco, the head of the UFT Borough Office at the time (now the Secretary of the UFT). Baskin's email substantiates the plaintiff's allegations that she suffered abuse at the hands of Mattera and Neis and was the victim of false allegations. **Exhibit A.** The email was also prophetic in terms of the false documentation and other bad faith dealings that followed.

25.     Baskin, again finally acting in defiance of Mattera's totalitarian regime, submitted positive reports based on his observation of the plaintiff's teaching on February 8 and May 16, 2011. He stated that Mattera was enraged at these reports and wanted them rigged to be negative ones. The situation became so untenable that Emil Pietromonaco moved his office <u>into</u> P.S. 11. Mattera was very taken aback by this action and became visibly fearful that her reprobate fiefdom would be exposed.

26.     The Baskin email was also alarming in that it was made clear that Mattera was looking to revoke the plaintiff's teaching license by issuing successive "U" ratings and then the

requisite, but equally corrupt, 3020a hearing.  In the email, Baskin also detailed how Mattera threatened his livelihood if the plaintiff were to pursue an investigation.  With Mattera being under the microscope and the plaintiff finally having the muscle of the UFT behind her, along with the truth in the form of the Baskin email, on May 23, 2011, there was little choice but to give the plaintiff a positive observation report for May 16, 2011. The purpose of these reports and observations is supposed to be to evaluate the ability of teachers. The plaintiff's ratings alone make it abundantly clear that the quality of her teaching was irrelevant, speaking again to the institution wide corruption at the DOE.

27.     It then became clear that Mattera's fear of the UFT did not last very long. On June 2, 2011, in a transparent attempt to continue the execution of her scheme, Mattera lied to Baskin by saying that the superintendent was demanding that the positive observation be retracted. Baskin said that he was under pressure from his union as well and the retraction was issued despite the content remaining the same. It is important to note the apparent credibility of Mattera's lie. The notion that a supervising power at the DOE wanting a report on the plaintiff changed should be scoffed at. Instead, it was taken very seriously as if this type of behavior is commonplace. No one blinked at the notion that the superintendent would be involved in the corruption, which speaks to how widespread the corruption is at the DOE.

28.     On June 14, 2011, the plaintiff received a glowing formal observation report for June 8, 2011. Pietromonaco told the plaintiff that the superintendent warned Mattera that the observation report had better be accurate and fair – and it was.

29.     On June 22, 2011 Pietromonaco told the plaintiff she would be receiving an "S" rating for the year.  However, Mattera was feeling quite confident despite the warning from the superintendent because she had boasted that DOE Office of Special Investigations, Detective

Boyles, was a friend of her fathers and that she had "nothing to worry about". Consequently, Pietromonaco informed the plaintiff that a new detective would be assigned to the case because of the obvious conflict of interest. He also informed the plaintiff that Mattera was quite upset that her father's friend would not be investigating the case. The new investigator, Lawrence Scott, would later prove to also be a friend of Mattera's father. Scott would eventually be dismissed/resign because of a highly publicized dalliance with a teacher *that he was investigating*. In something that can be only described as unchecked arrogance, Scott bragged in the newspaper about the power he had over teachers' careers. Unfortunately, Scott's corrupt nature did not come to light until 2013, long after he likely buried the plaintiff's case at OSI.

30. On June 23, 2011, true to Baskin's information based on Mattera's prediction, the plaintiff received the predetermined "U" rating for the 2010-2011 school year. Notwithstanding a glowing observation report from her June 8, 2011 observation as well as a similarly positive report from May 16, somehow it was determined the plaintiff's teaching was "unsatisfactory." Mattera clearly overrode her own union, the CSA, and her own supervisor, the superintendent, to advance her own malicious objectives. Days later, Pietromonaco informed the plaintiff that both the superintendent and a representative of the CSA apologized to him for the obvious breach in the agreement and further informed him that Mattera had absolutely nothing to base the unsatisfactory rating on. None of this seemed to matter though as the rating stood. The corruption was so rampant that even the superintendent and a CSA representative had no power to enact any change of the rogue principal's corruption.

31. Based upon the fabricated 'U' rating, from the 2010-2011 school year, on September 16, 2011, Mattera summoned the plaintiff to meet with her and Neis on September 21, 2011 "to discuss and formulate a Plan for Teacher Improvement." It was clear that Mattera and

Neis' bullying was intensifying to build the necessary case to have the plaintiff stripped of tenure and removed as a teacher. Pietromonaco told the plaintiff on September 19 that he would be present on the 21st and be part of the "investigation." He also said that the superintendent told him "Mattera doesn't listen and [she] has no control over her." This claim speaks volumes about the degree of corruption at the DOE that even after four years of blatant fraud committed by Mattera, no one seemed to be able to do anything about it. It is inconceivable to consider the notion that the superintendent has no control over this school principal.

32.     Pietromonaco also added that he arranged to meet with Deputy Chancellor Dorita Gibson. Because of the pressure brought to bear by Pietromonaco speaking to the people that he did speak to, the September 21, 2011 meeting was cancelled. However, on September 20, 2011 the plaintiff received a summons from Mattera to meet with her on September 22, 2011 "to investigate an allegation of corporal punishment." This was designed to be the centerpiece for the fabrication of a 'U' rating for the then current year. Ultimately, the plaintiff was told that the DOE "overruled" the summons that Mattera had issued but it has more recently turned up as part of the pending 3020a charges. It is mindboggling to consider how successful Mattera and Neis actually were at fabricating allegations of corporal punishment and the plaintiff's inability to teach. It seems absurd to think that after 12 years of having a flawless record that all of a sudden the plaintiff became violent and incapable of teaching effectively. It cannot be made any clearer that Neis and Mattera were on a mission to have the plaintiff discontinued as a teacher with the DOE, and that the malefactors' superiors were powerless to curb the rampant corruption.

33.     On September 27, 2011, Pietromonaco informed the plaintiff that he had heard from the investigator (Lawrence Scott) that he had enough information from Adam Baskin and didn't plan to talk to teachers. Also on September 27, the plaintiff received a letter from Mattera dated

September 26 to meet with her and Neis on September 28 "to discuss [her] instructional goals for the year." On September 28, Pietromonaco met with the superintendent and Mattera. Also on September 28, Pietromonaco informed the plaintiff the superintendent said that she did not "have to worry about [her] job or [her] license, and would not be 'remediated'…[She] would be like any other teacher." At the meeting, Mattera asked the superintendent if there was "a new school for [her]." Pietromonaco informed the plaintiff that both he and the superintendent agreed that Mattera was lying during the meeting. It was during the same conversation that Pietromonaco said that the plaintiff should meet with him and the superintendent, and that he has "never seen a person of this quality get a 'U'."

34.     On October 12, 2011, the plaintiff met with Pietromonaco and the superintendent. The superintendent said the plaintiff was "lovely and righteous, and reminded [her] of [her] daughter." Although the plaintiff has never even heard of a teacher meeting with the Principal and superintendent without UFT representation, on October 17, 2011, she met with the superintendent and Mattera. The conversation did not focus on the problems that Mattera and Neis were giving the plaintiff, but rather the discussion was a general one about education. Of the more memorable parts of the conversation was the shock and disturbance that the plaintiff experienced when Mattera told the superintendent that Mattera and the plaintiff frequently talk about how much alike they are, which supports the idea that Mattera does in fact have psychological problems. As educators and as human beings, the two cannot be more different. More important is the fact that the superintendent visited the plaintiff's classroom and had nothing but high praise for the set-up, the way that the plaintiff conducted herself, and the plaintiff's classroom atmosphere in general.

35.     On October 18, 2011, Mattera, completing ignoring everything the superintendent said on October 17, issued an "Action Plan" on the basis that the superintendent explicitly directed

the plaintiff to improve the quality of her teaching. Pietromonaco advised the plaintiff not to sign the bogus action plan.

36.     The level of corruption became even more apparent in November 2011 when the plaintiff was informed that Pietromonaco believed that Mattera sat alone with the OSI investigator, Lawrence Scott, to suppress information that should have been given to Richard Condon, Special Commissioner of Investigations. It was about the same time that the plaintiff was informed by a fellow teacher that Adam Baskin told her months ago that Mattera told him to pre-rate the plaintiff with a "U."

37.     It would have made sense in November 2011 if Mattera's attitude had changed, but it did not. In November 2011, the plaintiff's class was visited for a long period of time (only one other class was observed that day) by the quality review professionals.   Even Mattera acknowledged in a subsequent staff meeting that after thinking "we are dead" after the first day, the second day quite favorably impressed the quality review professionals.  It was the second day that the plaintiff's class and another class were observed.  Of course, Mattera did not give the plaintiff any credit and did not relent in her campaign to have the plaintiff removed from the school and have the plaintiff's license revoked. Ultimately, the plaintiff received a 'U' for the year despite glowing reports from the quality review professionals, who assessed every aspect of the plaintiff's performance without the jaded eye of Mattera, who was bent on revenge. It is patently absurd that Mattera got away with giving the plaintiff "U" ratings considering the unanimously positive reports the plaintiff received on her teaching from all unbiased observers.

38.     On November 8, 2011 Pietromonaco informed the plaintiff that he spoke to the lead attorney for NYSUT, Claude Hersh, who wanted to know immediately the results of the 'U' rating appeal.  Hersh said that if the documents were submitted and the advocate said it was biased and

predetermined, it must be reviewed.  Then, on November 15, 2011, Pietromonaco informed the plaintiff that he received an anonymous letter from somebody at OSI.  He told the plaintiff that he could not say anymore, but that things were getting "bigger and bigger and worse and worse."  Pietromonaco also informed the plaintiff that he spoke with Hersh and Adam Ross (Chief Attorney for the UFT), and that the three were considering referring the matter to the District Attorney's Office.

39.     On December 5, 2011, Pietromonaco said that the NYSUT and UFT lawyers advised holding off on exposing the anonymous OSI letter until the investigation was resolved.  Pietromonaco also told the plaintiff the anonymous letter was "very bad for Mattera".   On December 7, Pietromonaco said that he was calling the Deputy Chancellor's Office (Dorita Gibson).  On December 19, Pietromonaco received an e-mail from Despina Zaharakis at the DOE and that they had a conversation on December 21.  She informed Pietromonaco that she spoke to the head of OSI, and there seemed to be "irregularities" that she would check into.  On December 23, Pietromonaco said that he would meet with Adam Ross on December 27 to do paperwork for Richard Condon to investigate the investigator (Lawrence Scott) for corruption (this also borders on comical that the investigator needs to be investigated; it makes one wonder at what level the corruption actually stops).  Despite following Claude Hersh's direction, the plaintiff received notification on January 12, 2012 that the 'U' rating was sustained for the 2010-2011 school year.  A week later, Pietromonaco informed the plaintiff that Zaharakis "could not fathom" what had transpired and a lawsuit by the UFT would follow.  On January 24, 2012, Pietromonaco said the OSI investigation was "unfounded and dropped" and that he had made a complaint to UFT President Michael Mulgrew and Adam Ross.  The fact that no one had any idea what was going

on further supports what the plaintiff now realized was a previously unfathomable level of corruption. Once again, a lawsuit by the UFT was promised, but never materializd.

40.     On January 30, 2012, the plaintiff told Pietromonaco that it was suggested to her that the UFT make a complaint to the EEOC on her behalf.  In order to do that, the plaintiff needed to know the exact nature of the ridicule that Adam Baskin referred to in his "unchecked arrogance" e-mail (Exhibit A).  Pietromonaco refused to provide the plaintiff with a copy of that email and continues to refuse to this day to even describe the nature of the ridicule.  This resulted in another potential weapon taken out of the plaintiff's hands. It is evident now that the plaintiff was only given the illusion of union representation and involvement of lawyers, and as a result, was helpless to defend herself against the bullies.

41.     On February 2, 2012, Pietromonaco informed the plaintiff during the course of conversation that he had audio recordings of voicemails from Adam Baskin in which he could demonstrate the validity of what Baskin complained about to Mattera and Neis.  Despite the fact that these recordings were important to proving the plaintiff's allegations, Pietromonaco failed to divulge them despite the plaintiff's repeated requests.   The investigator allegedly being investigated for corruption, Lawrence Scott, requested the recordings, as well, to no avail.  Gaining no satisfaction or direction from the unions that were supposed to be protecting the plaintiff, she went to the District Attorney with the "unchecked arrogance" e-mail.  Subsequently, then District Attorney Dan Donovan referred the matter to Special Commissioner of Investigations, Richard Condon.  At approximately the same time the plaintiff received information that the DA referred the matter to Condon, Mattera screamed at the plaintiff that there is "no investigation" and befitting her duplicitous behavior, she stated that Pietromonaco, Lillian Kohler (Special Representative in the UFT Richmond County Office) and the superintendent were all on her side.

42.     On March 27, 2012, the plaintiff learned that SCI decided to refer her case back to OSI. This meant that the very same corrupt investigator would be receiving her case again. Justice was being denied again because of Mattera's father's relationship with OSI investigators. This action was one of the most shocking as it opened up the possibility that the institution wide corruption extended far beyond the DOE.

43.     In May 2012, Pietromonoco informed the plaintiff that he met with the superintendent and Mattera. He told the plaintiff that the verbal abuse set up letter from earlier in the year was now considered as unsubstantiated, having been overruled by the DOE. This deprived the bullies of a crucial document in trying to stick the plaintiff with a 'U' rating for the 2011-2012 school year. The plaintiff verily believes that the pressure brought to bear on them, and all the attention drawn to the situation is what prevented Neis and Mattera from executing their scheme.

44.     In May 2012, Adam Baskin suddenly withdrew his support for the plaintiff in any investigation. The sudden turnabout by Baskin raised serious questions as to why he refused to cooperate.

45.     With the very real threats to Mattera and Neis' plan being evident in 2012, the plaintiff was given an "S" rating for the 2011-2012 school year. However, this did not deter Mattera and Neis as the 2012-2013 school year was more of the same from them.

46.     The plaintiff had ongoing communications with Pietromonaco through the summer and the beginning of the school year, and learned that Adam Baskin refused to see him in late September – early October 2012. Pietromonaco made the plaintiff aware that a much bigger investigation was taking place given the obvious corruption.

47.     On October 10, 2012, Mattera waited for the plaintiff at the dismissal door and had somebody else dismiss her class. Mattera was obviously nervous and informed the plaintiff that

Lawrence Scott was waiting for the plaintiff in her office.  She said that she thought it was, "about that thing from two years ago."  When the plaintiff met Scott, he informed her that it was not about her and he handed her a letter requesting that she meet him at OSI with a UFT representative, and she was to schedule an appointment.  The plaintiff subsequently found out that she was to be interviewed by OSI concerning Adam Baskin's "unchecked arrogance" e-mail on October 24.  Mattera also made it a point to tell the plaintiff that she was to appear at OSI on October 25.  The plaintiff found out when the plaintiff appeared at the meeting that the meeting was occasioned by a letter from Richmond County District Attorney Dan Donovan that was prompted by the plaintiff's complaint about what was happening.

48.  In the period between Scott appearing and summoning the plaintiff to meet on October 24 and that actual meeting, Mattera unleashed her pit bull Neis on the plaintiff on October 16, 2012.  The two involved a parent and concocted a story with the intent of getting the plaintiff in further trouble.  The thrust of a follow-up meeting was that the plaintiff should not seek union involvement or even tell the union.  This is the type of behavior one would expect from guilty parties.

49.  A significant issue brought up at the October 24 meeting concerned audio recordings from Adam Baskin that Pietromonaco was in possession of from Baskin, whose silence had been bought by the award of a principal's position at a school in Brooklyn (it would appear that is why Baskin suddenly stopped cooperating with the investigation), had now disavowed the "unchecked arrogance" e-mail contents.  The audio recordings would serve to demonstrate, in Baskin's own voice, that the e-mails were the truth and that he had ulterior motives.

50.  On October 17, 2012, the plaintiff received a corporal punishment summons which, quite disturbingly, had a smiley face drawn by Mattera on the envelope. Subsequently, on October

17, Mattera informed the plaintiff that the allegation was unsubstantiated (clearly attributable to Lawrence Scott's surprise appearance at the school) and that the determination would "go to OSI" and that the plaintiff would get a copy of a letter from OSI declaring the allegations unsubstantiated.  That never occurred.

51.     The plaintiff believes the only reason why the pretext of corporal punishment didn't go further was because Mattera was the object of a reopened OSI investigation, which she thought her father had quashed.

52.     Being that Neis and Mattera were unable to frame the plaintiff with abuse charges, they resorted to the much more traditional tactic of finding fault with her teaching and manufacturing plans for her improvement which they would insure never took place.  The plaintiff was sent on fool's errands to observe other teachers in areas they claimed she was deficient in (even though she was not) and utilized Karen Marino to do much of their dirty work.  Marino was a younger teacher who was not very friendly to the plaintiff from the start, so she was ripe to be indoctrinated by the malefactors.  The plaintiff constantly kept Pietromonaco informed of the continued campaign against her and he expressed his understanding.  He discussed moving the plaintiff to another school and he added that Superintendent Claudio was "in her corner."

53.     Throughout December 2012, the plaintiff was experiencing a problem with a particular student and what she reported to Mattera on a number of occasions as violent and threatening behavior toward her as well as other students.  Mattera, instead of an appropriate reaction to address the issue and the child himself, chose to completely disregard the well being of the child and other students in order to portray the plaintiff as being incapable of controlling her students.  The plaintiff became so frustrated with Mattera's response that she requested Pietromonaco to enlist the help of the UFT to remove her from P.S.11 and put her in a school

where she would be safe; safe from Mattera and Neis, safe from other teachers and staff, and safe from students and parents.

54.     On December 20, 2012, the plaintiff reported to Mattera that four of her students sitting with the offending student at the same table informed her that the student in question had threatened violence against other children, other adults at P.S.11 and against her.  The police were summoned.  Clearly this was not a problem of the plaintiff's doing, but Mattera did her best to make it seem that way to anyone who was watching or listening.  A student had a problem that clearly required professional help, yet all Mattera could think about was how she could spin this to further her own malicious agenda against the plaintiff. This problem continued through January 2013.

55.     Mattera continued to neglect the problem and on January 29, 2013, the plaintiff reported to Mattera that students were complaining that when they were with another teacher, the very same student made violent threats that he was going to kill everyone in the class, cut everyone into pieces, put a nail in everyone's legs with a hammer, use a knife, gun, and sword, and will bring a pack of bombs and throw it, in addition to killing the plaintiff.  On January 31, 2013 after reporting about another student's violent threats, school security removed the student.  Mattera threatened to call the superintendent because of "another complaint" against the plaintiff. Appallingly, on February 1, 2013, Mattera stopped the plaintiff at the entrance of the school when she arrived for work to tell her that the police were called about this other student the day before, and that she was "not going to lose [her] job over this."

56.     The way Mattera was not going to lose her job was to try to pin the blame for the students' behavior on the plaintiff.  She told the plaintiff that she had decided to look at the problem "through the lens of engagement", meaning that the plaintiff was not engaging enough as a teacher

to thwart this behavior.  Meanwhile, the same students and others had demonstrated similar or worse behavior in other teachers' classrooms.  Somehow they were not viewed "through the lens of engagement" like the plaintiff was because the plaintiff was marked for discontinuance. February 2013 was marred by the continued campaign to make it look as if the plaintiff could not control her students, but one particular incident stands out among the others: Following a death threat from a student, it was reported to Mattera, who was obligated to summon the police – again. The police were not summoned.  Instead, Mattera faked an investigation and had the audacity to say that they police were "getting annoyed" about being called to the school so often.  Children who were most apt to violence and most vulnerable to it were deliberately placed in the plaintiff's classroom by Mattera and Neis.  The fact that Mattera would be obligated to summon the police and failed to again shows her calculated approach to this dreadful situation.

57.     On March 13, 2013, the plaintiff received a letter that was to go into her file, which completely misrepresented the rigged observation of February 13, 2013.  The circumstances under which Neis came to her classroom with a "witness" was nothing short of intimidation to force her to sign the letter (a prerequisite for it to go into her file).  The plaintiff signed it but put qualifying language in so that it would be understood that she was essentially being forced to sign it under duress.

58.     On or about March 18, 2013, yet another sham investigation was conducted based on a death threat.  The police were summoned, and probably due to Mattera's family members and friends who are police officers, no true investigation was conducted.  As had been the drill for some time, fingers were pointed at the plaintiff for not being able to control her students and not being able to teach.  Once again, as had also been the norm, these students who were perpetrating violent threats did not have any of their problems appropriately addressed.  They were simply used

20

opportunistically by Mattera to execute her scheme to discontinue the plaintiff's teaching license. The unwillingness of the police to properly address the situation is yet another example of pervasive corruption, as Mattera was somehow able to use her connections to manipulate the police.

59.     On March 20, 2013, the plaintiff met with Neis and the most recent troubled student's mother to discuss what had recently transpired. In a combined effort to make the plaintiff look bad and to placate this student's mother, Neis falsely claimed that the student was not feeling successful about her schoolwork. This was an absolute lie. It is noteworthy that the mother immediately agreed with the plaintiff's assessment that Neis was incorrect. It is abhorrent that Neis cared so little about the well being of this student and had no problem using the student as a pawn in her and Mattera' grand scheme against the plaintiff.

60.     In what can only be seen as a completely hypocritical attempt to set the plaintiff up further, her classroom was the dumping ground for students suspended in other teachers' classrooms. If the plaintiff is depicted as someone incapable of controlling her own students, according to Mattera and Neis, why would they think that she would be able to control other problem students?

61.     The plaintiff was the subject of more disparate treatment in the form of Neis demanding to see her lesson plans. It is noteworthy that the other second grade teacher, Karen Marino, told the plaintiff that she didn't even prepare lesson plans. The fact that Mattera and Neis were consistently able to get away with treating the plaintiff differently than every other teacher is indicative of an institution wide failure to properly monitor the actions of those in power.

62.     In May 2013, the plaintiff was deliberately served with a summons for professional misconduct that was returnable the same day her observation was scheduled to occur. This is a carefully thought out decision to ensure that the plaintiff would have to miss one of her obligations.

63.     On May 14, 2013, in her post-observation meeting with Neis and Mattera, the plaintiff was once again put in a position where she was ordered to sign something without having it reviewed.

64.     In May 2013, Pietromonaco represented the plaintiff against the false accusations of Neis. The plaintiff was accused of yelling at Neis on April 30, calling her a "malicious liar," and saying that she told lies about the plaintiff and the children (that part is true). Pietromonaco happened to be on the phone on April 30 when the alleged incident took place. The plaintiff neither raised her voice nor accused Neis of being a malicious liar. Nevertheless, the plaintiff was cited for misconduct.

65.     On May 16, 2013, the plaintiff received another summons shortly before 1:00 pm. On that day, she was once again bullied into signing another document by Neis and one of the school secretaries who was acting as a witness. The plaintiff once again signed "under duress" and indicated the document was "unread."

66.     The following day, Neis told yet another lie about the plaintiff. This one was to a student's parent who was concerned about the plaintiff's then frequent absences due to the intimidation and bullying at the hands of Neis and Mattera. She wanted to know who she could write to regarding the plaintiff's absences and she also informed the plaintiff that she informed Neis that when the plaintiff was absent, all of the children, including hers, were upset. She wanted to know from Neis where the plaintiff was. Neis lied and said the plaintiff took a couple of days off. Neis gave no indication as to what was really going on. The parent told the plaintiff that she

told Neis that she did not believe Neis "because that would be totally out of character for Miss Bartone." It speaks volumes to the character of the plaintiff that she was able to maintain her exemplary teaching qualities despite the turmoil going on outside of the classroom. It also speaks volumes as to the character of Neis and Mattera that they could not care less about the welfare of the students.

67.     That turmoil had spilled over into the world of gossip as by May 20, 2013, the plaintiff was being approached by various parents questioning her about rumors they heard. The plaintiff received another summons on May 20, returnable May 22, 2013.

68.     On May 21, 2013, the plaintiff was singled out at a grade meeting with other teachers and publicly lambasted and ridiculed for not possessing the same ability as other teachers because she is "not a parent."

69.     On May 23, 2013, Pietromonaco came to the school regarding the most recent summonses. He was taken aback by the vague nature of the allegations, which were simply confusing.

70.     On May 31, 2013, Neis was haranguing the plaintiff regarding all sorts of manufactured issues for which she was clearly preparing to issue a 'U' rating for the plaintiff's review. Again, the fact that Neis can do whatever she wants regarding the ratings shows how utterly meaningless they are, which is an indictment on the system as a whole.

71.     The children have never been the top priority at this school. The fact that the plaintiff was the victim of rampant bullying and abuse was disruptive and upsetting to the children, but neither Neis nor Mattera cared. This was another instance where Mattera and Neis were not bothered by the fact that their nefarious scheme to oust the plaintiff was harming the children. By this time, the plaintiff had already been fielding numerous inquiries from concerned parents about

23

what was happening. Essentially what Neis and Mattera had done in their effort to oust the plaintiff was to put the most violent and problematic children with the most vulnerable children, rather than employing common sense (and doing the children a service rather than a disservice) and place children in other classrooms in accordance with what would serve them best. The plaintiff's counterpart's classroom had none of the problematic children, but did contain many if not all of the PTA parents' children. The children the plaintiff had were children who did not speak English at home in large part, while the PTA parents' children both spoke English at home and had involved parents who could much more readily advocate on their behalf. This was all part of their ploy to prevent children and parents from coming to the plaintiff's defense.

72.     On or about the middle of June 2013, there was an incident concerning one of the plaintiff's more problematic students and Neis covering up an injury that occurred in another teacher's classroom. This was another action in an effort to prevent the police from visiting the school, yet again. The fact of the matter is that Mattera and Neis did an extremely poor job at running the school (described well by Adam Baskin as "completely dysfunctional…a hell hole") and were preoccupied with executing a vendetta against the plaintiff. Their obsession with the plaintiff was more important to them than doing right by the children and running the school properly and safely.

73.     Pietromonaco spoke on the plaintiff's behalf at the June 13, 2013 meeting. He informed the plaintiff on June 24 that the allegation in question was deemed unsubstantiated. The plaintiff never received a confirming letter.

74.     Despite the allegations being deemed unsubstantiated, Neis placed a derogatory letter in the plaintiff's file based upon the very same allegations. Neis claims it was in accordance with the advice of the legal department, which is an outrageous lie.

75.     On June 20, 2013 a student who had been suspended from the plaintiff's classroom for threats against her and transferred to the other second grade class was returned to her class on this day. The plaintiff received yet another summons regarding yet another false allegation of verbal abuse returnable on June 24. The plaintiff also received a predetermined "U" rating for the year.

76.     The plaintiff realized that the "U" rating that she received was going to be predetermined when Mattera called her classroom and said, "The police are getting annoyed." The fact of the matter is that a serious complaint about a particular student of the plaintiff's was sloughed off with a fake investigation and then deemed unsubstantiated. There were other students who had serious issues that were similarly sloughed off. It is also important to note that Neis and Mattera's attempt to set the plaintiff up in the Fall of 2012 was only derailed by Lawrence Scott's surprise appearance at the school. That clearly shook Mattera up, but only temporarily threw her off course.

77.     The plaintiff continued to seek a transfer out of P.S. 11 to put an end to the bullying and harassment she was being forced to endure. During the summer of 2013, Pietromonaco promised her that he would have her transferred to another school. However, on August 28, the plaintiff received an email from Pietromonaco stating "relief for the start of the school year is now not possible." Whether this was due to backstage corruption, the plaintiff cannot know for sure, but the widespread inability of anyone to do anything to help the plaintiff raises serious questions about the legitimacy of the entire institution.

78.     Having been forced to endure another year at P.S. 11, the plaintiff's misery continued on September 16, 2013, at the hands of Neis. Neis bullied the plaintiff in front of her students. Neis lied and claimed there were parent complaints about the plaintiff regarding

"procedures." She did not identify any parents or any "procedures" at issue. The incident upset the plaintiff's students, but it was abundantly clear by then that Neis did not care even the slightest bit about the welfare of the students. The plaintiff complained to Mattera about Neis, but obviously that was to no avail as the systems in place at the DOE clearly allow for authority figures to do whatever they want with no repercussions.

79.     It was ultimately discovered that the "complaints" about the plaintiff were actually questions from the PTA president, through Karen Gubnitsky, the parent coordinator, about homework assignments given to students by Mattera. It was Mattera who was the subject of the complaints, but she nonetheless tried to make the plaintiff the scapegoat and instructed the plaintiff to assume responsibility for the homework assignments.

80.     On October 31, 2013, the plaintiff received another bogus action plan and observation report from Mattera.  The action plan was based on a meeting the plaintiff had with Mattera on October 21, and the observation report was based on Mattera's observation of her classroom on October 28.  Both documents were comprised of complete lies and misleading statements designed to make the plaintiff look like an incompetent teacher.  The plaintiff made it known in writing to Mattera that she refuted the entire contents of both documents, and demanded a hearing with the superintendent/chancellor.

81.     On November 4, 2013, the plaintiff received a letter from Neis that stated because the plaintiff had not attended the meetings that they had been scheduling throughout October (because the plaintiff chose to wait until her union representative could be present), Neis had taken it upon herself to draw her own conclusions about the complaints against the plaintiff. She stated that the plaintiff had failed to differentiate instruction in the classroom and failed to communicate clearly with the students and parents (both lies).  Neis said that her (false) conclusions might lead

to disciplinary action, including charges leading to the plaintiff's termination (this was an oft heard refrain from Mattera and Neis).

82.     All of the abuse and harassment came to a head on November 8, 2013.  The plaintiff received another letter from Mattera regarding meetings she had missed (again, due to her exercising her right to have her union representative, Pietromonaco, present) to discuss allegations Mattera made against her stemming from a lockdown drill the school had.  Again, Mattera drew her own conclusions and said the plaintiff would be subject to disciplinary action.  The stress caused by the escalating threats to the plaintiff's career, coupled with all the bullying and harassment she had endured for years resulted in the plaintiff's hospitalization for stress induced chest pains. It is important to note that the plaintiff was not only suffering physically and emotionally, but was also being subject to disciplinary action for simply exercising her right to have her union representative present. The DOE's refusal to take any action, either precautionary, or reactionary, regarding Mattera's attempts to force the plaintiff to attend meetings unrepresented, is highly indicative of how deep the corruption runs.

83.     The actions of Mattera and Neis forced the plaintiff to report sick to the school until she could go through the process of obtaining an extended leave. The plaintiff provided the school with doctors' notes detailing her illness and stating that she could not attend work. Despite this disclosure of information, the plaintiff received a letter requesting a medical examination to determine her ability to come back to work only two days before the scheduled examination.  The letter threatened potential disciplinary action if she did not attend.  The conveniently short notice left the plaintiff no time to arrange for a representative of her choice to be present for this examination so she was forced to decline the examination.

84.    On January 15, 2014, the plaintiff was granted an extended leave for her absences from November 22, 2013 to January 31, 2014. During her absence from school, she continued to face false accusations created by Mattera and Neis, and was served with summonses to discuss them. By this point, the plaintiff was not medically able to attend any meetings with the people who had bullied her for years. On January 16, 2014, the plaintiff received a letter from Mattera where she again drew her own conclusions from her own falsified allegations. The plaintiff was again subject to disciplinary action. Mattera had consistently been falsifying allegations and then ruling on them without any hearing and without any involvement from a third party. It is mindboggling how not a single person at the DOE was monitoring Mattera's actions.

85.    As early as November 2013, the DOE, UFT, Mattera, and Neis all received multiple communications directly from the plaintiff's counsel, instructing them not to contact the plaintiff directly. These requests were ignored.

86.    Although the plaintiff was granted leave until January 31, 2014, she was denied leave from February 2014 through the end of the year. The basis for the denial of the medical sabbatical was that the source of the plaintiff's illness was lurking at P.S. 11. The DOE psychiatrist told the plaintiff that because she was not being transferred to another school, she could not grant the sabbatical stating that she had "rules to follow". This is particularly interesting because one would think that if the source of the illness was at P.S. 11, the only two viable solutions would be to either grant the plaintiff leave or transfer her to another school, neither of which occurred. The doctor's illogical actions continued in that the doctor agreed the plaintiff was disabled and offered to put the plaintiff on leave through the end of the year if the plaintiff signed a release waiving, among other things, the right to sue the DOE. The plaintiff refused to sign the release. The actions of the DOE psychiatrist raise serious concerns about the legitimacy of the entire system. Despite

the fact that the doctor works for the DOE and is thus inherently biased, the doctor's actions and conclusions did not logically follow with the diagnosis.

87.     The UFT was less than helpful in informing the plaintiff of her alternative leave options and made it exceedingly difficult to figure out what to do. The plaintiff continued to report her absences through the district's sub-registry until February 23, 2014, when there appeared to be an error in the system when the plaintiff input her identification and PIN. The plaintiff had previously received a call from Neis on February 4, stating that she should no longer use the sub-registry because, as Neis put it, "we know you're not coming to work." Subsequently, the DOE discontinued the plaintiff's employment claiming she was absent without notice. Being that Neis has been a main antagonist in this entire ordeal, the plaintiff could not trust her. The plaintiff went to the UFT and received no help. The plaintiff was left not knowing how to proceed.

88.     In February 2014, the plaintiff filed three grievances with the UFT regarding Mattera having violated the Collective Bargaining Agreement by improperly placing certain documents in the plaintiff's employee file. Mattera placed various letters in the plaintiff's employee file without giving the plaintiff a chance to read them, which is a direct violation of the CBA. There were letters that detailed accusations that were over 90 days old, which is also in direct violation of the CBA.

89.     In April 2014, the plaintiff was finally able to get some sort of response from the UFT as to her options regarding leave for the rest of the year. After filing for the proper leave and grace periods, per the UFT's guidance, she was shocked to find out she had been removed from payroll and was stripped of her medical benefits, with no notice.

90.     In April 2014, the plaintiff was terminated due to "absence without notice," which was interesting given the fact that the plaintiff had always provided notice as described previously

(calling the sub-registry, providing doctors' notes, etc.). It takes very little inference to connect the dots between Neis' phone call telling the plaintiff to stop giving such notice and the plaintiff's subsequent termination due to failure to provide notice. The plaintiff had previously filed for Line of Duty Injury status, which prevented termination. The DOE reversed the plaintiff's termination.

91.     The plaintiff has repeatedly attempted to resolve the issues between her and Neis and Mattera through the DOE, relying on the UFT for help. No progress was made and the plaintiff has exhausted her resources.

92.     The plaintiff has filed a charge of discrimination, which was given number 520201501912.

## AS AND FOR A FIRST CAUSE OF ACTION FOR VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

93.     Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's as if more fully realleged and set forth at length herein.

94.     That the defendants' actions unlawfully discriminated against the plaintiff as a result of her disability.

95.     As a result of the foregoing, the plaintiff sustained economic damages.

96.     As a result of the aforesaid, the plaintiff was rendered sick, lame, and disabled, suffered, still suffers, and will continue to suffer for some time to come from great pain, mental anguish, nervous shock, and was incapacitated from attending to her usual duties, all to her damage.

## AS AND FOR A SECOND CAUSE OF ACTION FOR SUBSTANTIAL INTERFERENCE WITH CONSTITUTIONALLY GUARANTEED RIGHTS

97.     Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's complaint as if more fully realleged and set forth at length herein.

98.     That the defendants' actions violated the Fourteenth Amendments protection of all persons, limiting the power of the States to interfere with the First Amendment freedoms of speech and association, in that the plaintiff was rendered incapable of availaing herself of union assistance due to the willful interference of defendants.

99.     As a result of the foregoing, the plaintiff sustained economic damages.

100.     As a result of the aforesaid, the plaintiff was rendered sick, lame, and disabled, suffered, still suffers, and will continue to suffer for some time to come from great pain, mental anguish, nervous shock, and was incapacitated from attending to her usual duties, all to her damage.

## AS AND FOR A THIRD CAUSE OF ACTION FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

101.     Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's complaint as if more fully realleged and set forth at length herein.

102.     That the egregious conduct of defendants Mattera and Neis was a deliberate attempt to cause emotional distress to the plaintiff.

103.     As a result of the foregoing, the plaintiff sustained economic damages.

104.     That by reason of the aforesaid, the plaintiff was rendered sick, lame and disabled, suffered, still suffers, and will continue to suffer for some time to come from great pain, mental anguish, nervous shock, and was incapacitated from attending to her usual duties, all to her damage.

## AS AND FOR A FOURTH CAUSE OF ACTION FOR BREACH OF CONTRACT

105.     Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's complaint designated as if more fully realleged and set forth at length herein.

106.    That in or about 1995, the defendants and the plaintiff entered into an employment agreement that governed the employer/employee relationship in the form of the collective bargaining agreement.

107.    That the egregious, unjustified conduct of the defendants constitutes a breach of the employment agreement between the plaintiff and defendants.

108.    As a result of the foregoing, the plaintiff sustained economic damages.

## AS AND FOR A FIFTH CAUSE OF ACTION FOR DEFAMATION

109.    Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's complaint designated as if more fully realleged and set forth at length herein.

110.    That the defendants, Mattera and Neis' derogatory statements about the plaintiff contained, or created the impression of facts that are false and that malign the plaintiff's professional and business abilities. The defendants' publication of such statements of the public or others who have no need to know them were made with the defendants' knowledge of their falsity, or with reckless disregard of their falsity.

111.    As a result of the foregoing, the plaintiff sustained economic damages.

112.    That by reason of the aforesaid, the plaintiff was rendered sick, lame, and disabled, suffered, still suffers, and will continue to suffer for some time to come from great pain, mental anguish, nervous shock, and was incapacitated from attending to her usual duties, all to her damage.

## AS AND FOR A SIXTH CAUSE OF ACTION FOR *PRIMA FACIE* TORT

113.    Plaintiff repeats, reiterates, and realleges, each of the allegations contained in the plaintiff's complaint designated as if more fully realleged and set forth at length herein.

114.    That the defendants' actions constitute a *prima facie* tort.

115.    As a result of the foregoing, the plaintiff sustained economic damages.

116.    That by reason of the aforesaid, the plaintiff was rendered sick, lame, and disabled, suffered, still suffers, and will continue to suffer for some time to come from great pain, mental anguish, nervous shock, and was incapacitated from attending to her usual duties, all to her damage.

WHEREFORE, the Plaintiff, ELISA BARTONE, demands judgment against defendants on the First, Second, Third, Fourth, Fifth, and Sixth Causes of Action in the aggregate sum of $30,000,000.00, together with costs, interest, attorneys' fees, punitive damages, and such other and further relief as this Court deems just and proper.

Dated:  Staten Island, New York
November 5, 2015

THE BEHRINS LAW FIRM PLLC

By: _____
JONATHAN B. BEHRINS
Attorneys for Plaintiff
1110 South Avenue (Suite 402)
Staten Island, New York 10314
(718) 447-5540

To:    ERICA MATTERA & BARBARA NEIS
c/o P.S. 11
50 Jefferson Street
Staten Island, New York 10304

N.Y.C. DEPARTMENT OF EDUCATION
52 Chambers Street, Room 320, B4
New York, New York 10007

33

# EXHIBIT A

**Emil Pietromonaco**

| | |
|---|---|
| From: | Adam Baskin [adambaskin1@yahoo.com] |
| Sent: | Saturday, May 21, 2011 3:40 PM |
| To: | Emil Pietromonaco |
| Subject: | Unchecked Arrogance |

5/21/11

Dear Mr. Pietromonaco,

I am writing to delineate abusive behavior on the part of Erica Mattera and illegally placed ATR (Absent Teacher Reserve) Coach Barbara Neis with regard to teacher Elisa Bartone and other staff members.

On February 8, 2011 I was instructed to observe Elisa Bartone. Principal Erica Mattera stated, "you know where this is going", referring to the numerous times she stated that Ms. Bartone will be receiving a U Rating for the year as well as for the upcoming 2011-2012 school year in order to revoke her teaching license through a 3020A Hearing. I informed Ms. Mattera that the lesson I had observed was satisfactory and she screamed at me and told me that I was not a team player. I wrote up a positive informal observation and gave a copy to Elisa Bartone. Erica Mattera told me she would have to "take care of this herself." I was instructed to observe Elisa Bartone on May 16th 2011. I informed Ms. Mattera that the lesson was satisfactory and she became enraged. She told me I needed to find something and to dig deeper to make sure it was a U. On the evening of May 19th Ms. Mattera was under the impression that Ms. Bartone was started a letter writing campaign against her. Ms. Mattera lunged toward me in a threatening manner and pointed at me and screamed "If she (referring to Elisa Bartone) comes after me, you are fuckin' done. You hear me, done. " Ms. Mattera went back to her desk and threw her uneaten lunch in the garbage screaming that this was making her sick. On Friday May 20th I phoned Elisa Bartone and let her know that I would be giving her a satisfactory write up for the observation.

Ms. Mattera has informed me numerous times that Ms. Bartone's upcoming formal observation in June will be rated unsatisfactory. She has informed me

numerous times that Ms. Bartone will be rated unsatisfactory for the 2010-2011 school year as well as for the 2011-2012 school year.

Ms. Mattera has also mentioned to Ms. Neis that they have to "construct" a log of assistance for Ms. Bartone. Ms. Neis does not work with Ms. Bartone but Ms. Mattera informed her that they needed to construct one to substantiate the U Rating.

In addition, Ms. Neis and Ms. Mattera have also ridiculed Ms. Bartone in front of me, which has been extremely unprofessional.

Aside from Ms. Bartone, many other staff members have been harassed and they have informed me (and will be informing you on Monday) that they feel it inhibits their ability to teach effectively. Ms. Mattera's intimidating and threatening behavior makes them uncomfortable to come to work.

The students that are in the classroom adjacent to Ms. Mattera's office and the office staff have been subjected to overhearing Ms. Mattera's screaming and obscenities on a daily basis. The school secretary has been informed to let Ms. Mattera know if there are parents in the office so she will know to tone it down. Ms. Mattera has bragged on a regular basis about learning how to "close the door and roar" from Mentor Principal Lisa Esposito.

I can provide more information about other staff members, but they have informed me that they will be sharing their stories of abuse and intimidation with you directly.


Sincerely,

Adam Baskin