UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------
ELISA BARTONE,

                      Plaintiff,                **MEMORANDUM & ORDER**
                                                              15-CV-6362 (MKB)
       v.

ERICA MATTERA, BARBARA NEIS and NEW
YORK CITY DEPARTMENT OF EDUCATION,

                      Defendants.
---------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

      On November 5, 2015, Plaintiff Elisa Bartone commenced the above-captioned action against Defendants Erica Mattera, Barbara Neis and the New York City Department of Education (the "DOE"), alleging that Defendants discriminated against her in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* (the "ADA"). Plaintiff alleges that Defendants terminated her employment when she took leave for medical reasons and retaliated against her for exercising her First Amendment rights when she declined a position at her school and reported corrupt practices occurring at the school. (Compl. ¶¶ 93–100, Docket Entry No. 1.) Plaintiff also brings state-law claims for the intentional infliction of emotional distress, breach of contract, defamation and prima facie tort. (*Id.* ¶¶ 101–116.) On May 27, 2016, Defendants moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (Defs. Mot. to Dismiss ("Defs. Mot."), Docket Entry No. 16; Defs. Mem. in Supp. of Defs. Mot. ("Defs. Mem."), Docket Entry No. 18.) For the reasons discussed below, Defendants' motion to dismiss is granted.

## I. Background

The following facts are taken from the Complaint and are accepted as true for the purpose of deciding the motion.

In 1995, Plaintiff began her employment with the DOE at Public School ("P.S.") 11 in New York City. (Compl. ¶ 9.) Until 2007, Plaintiff worked as a first-grade teacher at P.S. 11. (*Id.* ¶ 14, 18.) Plaintiff alleges that "around the middle of 2007 and continuing to the present," Mattera, the principal of P.S. 11, and Neis, a coach at P.S. 11 who became the assistant principal in 2008, subjected her to "vindictive and vicious abuse, bullying[] and harassment, and . . . an extremely hostile work environment." (*Id.* ¶ 10.)

### a. 2006–2007 academic year

In December of 2006, while being formally observed by Mattera, Plaintiff and her class presented a type of reading comprehension presentation called "Readers' Theater." (*Id.* ¶ 11.) In May of 2007, Mattera created a "cluster teacher" position for a new program based on Plaintiff's Readers' Theater program, and asked Plaintiff to lead the program. (*Id.* ¶ 12.) Plaintiff declined the new position several times, but Mattera became increasingly insistent that Plaintiff fill the position, telling Plaintiff, "[y]ou have to take [the position] because you are the only one who could help raise the school's test scores and prevent me from losing my job." (*Id.* ¶¶ 13–14.) According to Plaintiff, Mattera indicated that if Plaintiff refused the position, there would be "a reorganization" of the teaching positions. (*Id.* ¶ 14.) Nevertheless, Plaintiff refused the position. (*Id.* ¶¶ 15–16.) On the day that Plaintiff unequivocally refused the position, Mattera informed her that a parent was "livid" because Plaintiff had permitted a child to wet herself at school. (*Id.* ¶ 16.) Mattera advised Plaintiff that she might receive a summons and be subject to investigation as a result of the parent's accusation. (*Id.*) The student was removed from Plaintiff's care

several days later, but no investigation took place. (*Id.* ¶ 17.)

In June of 2007, Plaintiff learned that she had been reassigned to teach the second grade during the upcoming academic year. (*Id.* ¶ 18.) On the day of her reassignment, Plaintiff received a summons alerting her that the DOE was investigating her for "corporal punishment." (*Id.*) This was Plaintiff's first summons from the DOE. (*Id.*) Plaintiff reported the summons to her union, the United Federation of Teachers ("UFT"), and a UFT representative "stated that there was a link between [P]laintiff's refusal to accept the Readers' Theater position and the summons." (*Id.*) On June 26, 2007, Plaintiff received a letter from Mattera stating that the allegation of corporal punishment had been unsubstantiated. (*Id.*)

Plaintiff received a "satisfactory"[1] rating for the 2006–2007 and 2007–2008 academic years. (*Id.* ¶ 19.) In 2008, Adam Baskin was named probationary assistant principal at P.S. 11. (*Id.*) At the end of the 2008–2009 academic year, Plaintiff received her first "unsatisfactory" rating as a teacher. (*Id.*) Plaintiff challenged that rating and was still in the process of doing so when she filed the Complaint. (*Id.*)

**b. 2010–2011 academic year**

On October 14, 2010, Baskin told Plaintiff that Neis was the "main cause" of Plaintiff's "unsatisfactory" rating at the end of the 2008–2009 academic year.[2] (*Id.* ¶ 20.) Baskin told Plaintiff that Mattera and Neis were acting maliciously toward Plaintiff. (*Id.*) On February 8,

---

[1] According to the Complaint, teachers are given either an "S" rating, for "satisfactory," or a "U" rating, for "unsatisfactory." (Compl. ¶ 19 n.1.) The Complaint does not specify who provides these ratings, when, or on what grounds.

[2] The Complaint does not indicate whether Plaintiff received a "satisfactory" or "unsatisfactory" rating during the 2009–2010 academic year.

3

2011, Baskin informed Plaintiff that Neis would be assuming the role of assistant principal and advised Plaintiff to "get out [of the school] because things would get even worse." (*Id.* ¶ 21.) Baskin also observed Plaintiff's class that day and, two days later, told Plaintiff that although he had given Plaintiff a positive report, Mattera had ordered him to "make it negative." (*Id.* ¶ 22.) Sometime thereafter, Plaintiff was accused of verbal abuse.[3] (*See id.* ¶ 23.) On March 9, 2011, Baskin gave Plaintiff a letter from Mattera. (*Id.*) According to Plaintiff, Mattera falsely substantiated the allegations in order to support a future "unsatisfactory" rating for Plaintiff's work. (*Id.*)

On May 16, 2011, Baskin again observed Plaintiff's class. (*Id.* ¶ 24.) His verbal report was "very positive," and he stated that Plaintiff would receive a similarly positive written report. (*Id.*) On May 18, 2011, Baskin told Plaintiff that Mattera had ordered him to give Plaintiff a negative report in order to support the "unsatisfactory" rating that Mattera intended to give Plaintiff that year. (*Id.*) Nevertheless, Baskin submitted positive reports based on his observations of Plaintiff's teaching on February 8 and May 16, 2011. (*Id.* ¶ 25.) Baskin also submitted an e-mail to Emil Pietromonaco, the head of the UFT Borough Office at the time of the incident. (*Id.*; *see* Baskin Letter dated May 21, 2011 ("Baskin Letter"), annexed to Compl. as Ex. A.) In his e-mail, Baskin relayed that Mattera had pressured and threatened him to provide negative reports of Plaintiff's teaching in order to build a case against Plaintiff that would ultimately support a revocation of her teaching license. (Baskin Letter.) According to Baskin's email, Mattera had decided that Plaintiff would receive an "unsatisfactory" rating for the 2010–

---

[3] The Complaint does not provide the details of this accusation.

2011 and 2011–2012 academic years, and Mattera was working with Neis to falsely substantiate those ratings. (*Id.*; *see* Compl. ¶ 26.)

On June 2, 2011, Mattera told Baskin that the district superintendent had demanded that Baskin retract his positive assessment of Plaintiff's teaching. (Compl. ¶ 27.) On June 8, 2011, Plaintiff was once again observed in the classroom, and she received a "glowing formal observation report"[4] because the superintendent had "warned Mattera that the observation report had better be accurate and fair." (*Id.* ¶ 28.) On June 23, 2011, Plaintiff received an "unsatisfactory" rating for the 2010–2011 academic year. (*Id.* ¶ 30.) Plaintiff appealed this rating, and the rating was upheld in early January of 2012. (*Id.* ¶ 39.)

c. **2011–2012 academic year**

Because Plaintiff's teaching was assessed to be "unsatisfactory" during the 2010–2011 academic year, Mattera and Neis, then the assistant principal, met with Plaintiff in September of 2011 to place her on a "Plan for Teacher Improvement." (*Id.* ¶ 31.) On September 22, 2011, Plaintiff received a notice that she and Mattera would be meeting to discuss allegations that Plaintiff used corporal punishment. (*Id.* ¶ 32.) The meeting never occurred, and Plaintiff was told that the DOE "overruled" Mattera's concerns.[5] (*Id.*) On October 18, 2011, Mattera issued Plaintiff an "Action Plan" to improve the quality of her teaching, apparently at the superintendent's behest. (*Id.* ¶ 35.) In November of 2011, "quality review professionals" came

---

[4] The Complaint does not state who observed Plaintiff and provided the observation report.

[5] The Complaint refers to various investigations by the district superintendent and by Pietromonaco and the UFT into Mattera's behavior at the school, but does not provide sufficient detail for the Court to understand the nature of the investigations or their relevance to Plaintiff's allegations.

5

to P.S. 11 to observe certain classes, including Plaintiff's, and left with a favorable impression. (*Id.* ¶ 37.) Plaintiff was given a "satisfactory" rating for the 2011–2012 academic year.[6] (*Id.* ¶ 45.)

### d. 2012–2013 academic year

Plaintiff generally alleges that in the fall of 2012, Mattera "unleashed her pit bull Neis" on Plaintiff, and that Mattera and Neis "involved a parent and concocted a story with the intent of getting [P]laintiff in further trouble." (*Id.* ¶ 48.) On October 17, 2012, Plaintiff received a notice regarding an allegation that she had engaged in corporal punishment. (*Id.* ¶ 50.) Mattera subsequently determined that the corporal punishment allegation was unsubstantiated. (*Id.*)

In December of 2012, Plaintiff reported to Mattera that she was having difficulty with a particular student who had threatened others with violence. (*Id.* ¶ 53.) On December 20, 2012, Plaintiff reported to Mattera that four of Plaintiff's students informed her that the same student had threatened them with violence. (*Id.* ¶ 54.) Mattera called the police, and Plaintiff alleges that Mattera "did her best to make it seem [like this was Plaintiff's fault]." (*Id.*) On January 29, 2013, Plaintiff reported to Mattera that the same student had made violent threats about killing everyone in the school. (*Id.* ¶ 55.) On January 31, 2013, Plaintiff reported another student to school security. (*Id.*) School security contacted the police and had the student removed from school. (*Id.*) According to Plaintiff, Mattera was irritated by police scrutiny and attempted to "pin the blame for the students' behavior" on Plaintiff. (*Id.* ¶ 56.) In February of 2013, Plaintiff reported that she had received a death threat from a student. (*Id.*) Mattera did not call the police

---

[6] Elsewhere, Plaintiff suggests that she was given an "unsatisfactory" rating for the 2011–2012 academic year. (*See id.* ¶ 37 ("Ultimately, the plaintiff received a 'U' for the year despite glowing reports from the quality review professionals, who assessed every aspect of the plaintiff's performance without the jaded eye of Mattera, who was bent on revenge.").)

and instead "faked an investigation" and stated that the police were "getting annoyed" about being called to the school so often. (*Id.*)

On March 20, 2013, Plaintiff met with Neis and "the most recent troubled student's mother" to discuss that student's threats. (*Id.* ¶ 59.) At the meeting, Neis suggested that the student was behaving poorly because she felt she was not performing well academically. On April 30, 2013, Plaintiff was accused of calling Neis a "malicious liar" and given a "citation for misconduct" in connection with that incident. (*Id.* ¶ 64.) On May 17, 2013, a parent contacted Neis regarding Plaintiff's "then frequent absences due to [] intimidation and bullying at the hands of Neis and Mattera." (*Id.* ¶ 66.) Neis told the parent that Plaintiff had taken "a couple of days off." (*Id.*) On June 20, 2013, a student who had been suspended from Plaintiff's class for threats against her returned to the school. (*Id.* ¶ 75.) On June 24, 2013, Plaintiff was accused of verbally abusing a student, and although the charge was deemed unsubstantiated, Neis placed a letter in Plaintiff's file regarding the allegation. (*Id.* ¶¶ 73–75.) Plaintiff received an "unsatisfactory" performance rating for the 2012–2013 academic year. (*Id.* ¶ 75.)

e.  **2013–2014 academic year**

By 2013, Plaintiff was seeking a transfer from P.S. 11 to another school. (*Id.* ¶ 77.) On September 16, 2013, Neis "bullied" Plaintiff in front of her students and claimed that parents had complained about Plaintiff's "procedures." (*Id.* ¶ 78.) On October 28, 2013, Mattera observed Plaintiff teaching in the classroom, and, on October 31, 2013, Plaintiff received another "Action Plan" and observation report based on that observation. (*Id.* ¶ 80.) Plaintiff disputed the contents of both documents, which she claims were "comprised of complete lies and misleading statements designed to make [her] look like an incompetent teacher." (*Id.*)

On November 4, 2013, Plaintiff received a letter from Neis, informing her that because

she had not attended meetings with Neis throughout October, Neis had decided to substantiate the allegations against Plaintiff.[7] (*Id.* ¶ 81.) According to Plaintiff, she had decided to postpone these meetings until her union representative was available to attend them. (*Id.* ¶¶ 81–82.) On November 8, 2013, Mattera sent Plaintiff a letter regarding the meetings Plaintiff had missed and "allegations Mattera had made against her stemming from a lockdown drill the school had." (*Id.* ¶ 82.) Plaintiff was then hospitalized for stress-induced chest pains. (*Id.*) Plaintiff alleges that she was forced to report sick to the school until she could obtain an extended leave, but that she provided the school with doctors' notes detailing her illness. (*Id.* ¶ 83.) Sometime thereafter, Plaintiff was given forty-eight hours' notice to report for a medical examination to determine her ability to return to work. (*Id.*) She declined the examination because the notice provided her with insufficient time to obtain union representation for the examination. (*Id.*)

On January 15, 2014, Plaintiff was granted an extended leave for her absences from November 22, 2013 through January 31, 2014. (*Id.* ¶ 84.) During Plaintiff's leave, Mattera and Neis made "false accusations" against Plaintiff.[8] (*Id.* ¶ 85.) Plaintiff applied for, and was denied, a "medical sabbatical" from February of 2014 through the end of the year. (*Id.* ¶ 86.) On February 4, 2014, Neis told Plaintiff to stop using the DOE's online substitute-teacher portal to report her absences. (*Id.* ¶ 87.) Plaintiff mistrusted Neis and continued to use the portal until February 23, 2014, when the system gave her an error message. (*Id.*) In April of 2014, the DOE discontinued Plaintiff's employment, claiming that Plaintiff was "absent without notice." (*Id.* ¶ 87, 90.) Sometime thereafter, the DOE reversed its decision of termination. (*Id.* ¶ 90.)

---

[7] The Complaint does not specify the allegations at issue in October and November of 2013.

[8] The Complaint does not identify the nature of the accusations against Plaintiff.

8

On March 25, 2015, Plaintiff filed a charge with the Equal Employment Opportunity Commission (the "EEOC"). (*Id.* ¶ 5.) On August 31, 2015, the EEOC issued a notice informing Plaintiff of her right to sue. (*Id.* ¶ 6.)

**II. Discussion**

    a. **Standard of review**

In reviewing a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must construe the complaint liberally, "accepting all factual allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor." *Concord Assoc's, L.P. v. Entm't Prop. Trust*, 817 F.3d 46, 52 (2d Cir. 2016) (quoting *Chambers v. Time Warner Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)); *see also Tsirelman v. Daines*, 794 F.3d 310, 313 (2d Cir. 2015) (quoting *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997)). A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Matson v. Bd. of Educ.*, 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013). Although all allegations contained in the complaint are assumed true, this principle is "inapplicable to legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678.

    b. **ADA claim**

Plaintiff claims that Defendants discriminated against her on the basis of her disability, in

violation of the ADA.[9] (Compl. ¶ 94.) Defendants argue that Plaintiff's claim for disability discrimination is barred by the 300-day statute of limitations applicable to claims under the ADA. (Def. Mem. 6–7.) Defendants also argue that Plaintiff fails to state a claim for disability discrimination under the ADA because (1) the ADA does not provide for individual liability as to Mattera and Neis, (2) Plaintiff does not allege that she was "disabled" within the meaning of the ADA, and (3) Plaintiff does not allege that she suffered an adverse employment action within the meaning of the ADA. (*Id.* at 8–11.) Because the Court finds that Plaintiff's ADA claim is barred by the applicable statute of limitations, the Court declines to decide whether Plaintiff states a claim under the ADA.

Before filing an ADA action in federal court, a plaintiff must timely file charges of employment discrimination with the EEOC. 42 U.S.C. § 12117(a) (incorporating into the ADA the remedies and procedures set forth in 42 U.S.C. § 2000e-5); *Ayazi v. N.Y.C. Dep't of Educ.*, 586 F. App'x 600, 602 (2d Cir. 2014); *McGullam v. Cedar Graphics, Inc.*, 609 F.3d 70, 75 (2d Cir. 2010); *Williams v. N.Y.C. Hous. Auth.*, 458 F.3d 67, 69 (2d Cir. 2006) (citing 42 U.S.C. § 2000e-5). In New York, a federal employment discrimination claim is time-barred unless the plaintiff first files an EEOC charge within 300 days of the alleged discrimination. *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 79 (2d Cir. 2015) (quoting 42 U.S.C. § 2000e-5(e)(1)); *see also Wade v. N.Y.C. Dep't of Educ.*, --- F. App'x ---, ---, 2016 WL 3569897, at *1 (2d Cir. 2016) (noting that "the ADA require[s] a plaintiff to file a notice with the EEOC within 300 days of an alleged adverse action" (citing *Harris v. City of New York*, 186 F.3d 243, 247 (2d Cir. 1999))); *McGullam*, 609 F.3d at 75. This requirement is analogous to a statute of

---

[9] Plaintiff does not name or state the nature of her disability.

limitations. *Vega*, 801 F.3d at 79; *Patterson v. Cty. of Oneida*, 375 F.3d 206, 220 (2d Cir. 2004) (dismissing as untimely claims based on conduct that occurred more than 300 days prior to the filing of EEOC charge).

Plaintiff filed a charge with the EEOC on March 25, 2015. (Compl. ¶ 5.) Under the 300-day statutory period for filing, Plaintiff's discrimination claim must be predicated on conduct that occurred on or after May 29, 2014. *See Vega*, 801 F.3d at 79. According to the Complaint, the last alleged act of discrimination — Plaintiff's termination from her position — occurred sometime in April of 2014. (*See id*. ¶¶ 87, 90.) Because Plaintiff has not alleged a violation of the ADA within the 300-day statutory filing period, Plaintiff's claim under the ADA is dismissed.[10] *See Ayazi*, 586 F. App'x at 602 (upholding dismissal where the plaintiff's claims

---

[10] Plaintiff's claim under the ADA is also deficient against Mattera and Neis because neither Mattera nor Neis is subject to liability under the ADA. In order to state a prima facie case for disability discrimination in violation of the ADA, "a plaintiff must show by a preponderance of the evidence that: (1) [her] employer is subject to the ADA; (2) [s]he was disabled within the meaning of the ADA; (3) [s]he was otherwise qualified to perform the essential functions of [her] job, with or without reasonable accommodation, and (4) [s]he suffered adverse employment action because of [her] disability." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) (quoting *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006)). Although the New York City Department of Education is an employer subject to the ADA, Mattera and Neis are neither Plaintiff's employers nor, as individuals, subject to liability under the ADA. *See Spiegel v. Schulmann*, 604 F.3d 72, 79–80 (2d Cir. 2010) (holding that the anti-retaliation provision of the ADA does not provide for individual liability); *Corr v. MTA Long Island Bus*, 199 F.3d 1321, 1999 WL 980960, at *2 (2d Cir.1999) (affirming district court's conclusion that there is no right of recovery against individual defendants for employment discrimination in violation of the ADA); *Sherman v. Cty. of Suffolk*, 71 F. Supp. 3d 332, 343 (E.D.N.Y. 2014) (concluding that because courts routinely interpret the ADA in line with Title VII, there is no individual liability for employment discrimination claims under Title I of the ADA). In addition, Plaintiff's ADA claim is deficient because she has not sufficiently alleged that she had a disability or was "regarded as" having a disability within the meaning of the ADA, *see Kinneary v. City of New York*, 601 F.3d 151, 156 (2d Cir. 2010), or that she suffered an adverse employment action as a result of disability discrimination, *see McMillan*, 711 F.3d at 125 (stating that a plaintiff must show that she was "disabled within the meaning of the ADA" and "suffered adverse employment action because of [her] disability" (citation omitted)). Plaintiff does not state that she had a disability or that she was regarded as having had a

"fell well outside the ADA's 300-day limitations period" (citing *Butts v. N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993))); *Hoffman*, 443 F. App'x at 649–50 (dismissing an ADA claim because the complaint "fail[ed] to allege a violation of the ADA that [fell] within the 300-day window").

### c. First Amendment retaliation claim

Plaintiff argues that "Defendants' retaliatory behavior began when [] Plaintiff told Defendant Mattera that she was declining the Readers' Theater position. As time went on, all statements made by [] Plaintiff regarding the unlawful practices of Defendants Mattera and Neis were met with retaliatory action." (Pl. Opp'n to Defs. Mot. ("Pl. Opp'n") 5, Docket Entry No. 15.) Plaintiff describes this retaliatory action as "constant abuse and ridicule." (*Id.*) Defendants argue that Plaintiff's First Amendment retaliation claim is time-barred as to events that occurred more than three years prior to the filing of the Complaint, and that the remainder of Plaintiff's claim fails because she did not speak as a citizen on a matter of public concern, as First Amendment protection requires. (Def. Mem. 11–13.)

"To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Puglisi v. Town of Hempstead, Dep't of Sanitation, Sanitary Dist. No. 2*, 545 F. App'x 23, 26 (2d Cir. 2013) (quoting *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267,

---

disability. (*See generally* Compl.) Nor does Plaintiff allege that she was subject to an adverse employment action, defined as "a materially adverse change in the terms and conditions of employment." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 n.7 (2d Cir. 2008). Plaintiff alleges that she was terminated from her position in April of 2014, (*see* Compl. ¶ 90), but subsequently states that "[t]he DOE reversed [her] termination," (*id.*), and has alleged no other adverse employment action.

272 (2d Cir. 2011)); *see also Adams v. Ellis*, 536 F. App'x 144, 144 (2d Cir. 2013); *Wrobel*, 692 F.3d at 27; *Singh v. City of New York*, 524 F.3d 361, 372 (2d Cir. 2008).

The Supreme Court has instructed courts to conduct a two-step inquiry into whether a public employee's speech is entitled to protection:

> The first [step] requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public.

*Lane v. Franks*, 573 U.S. ---, ---, 134 S.Ct. 2369, 2378 (2014) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)). Under this test, the First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" *Singer v. Ferro*, 711 F.3d 334, 339 (2d Cir. 2013) (alterations in original) (quoting *Garcetti*, 547 U.S. at 418); *see also Garcia v. Hartford Police Dep't*, 706 F.3d 120, 129–30 (2d Cir. 2013) ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ." (citation and internal quotation marks omitted)).

Describing the first step in the two-step inquiry, the Supreme Court distinguished between speech made as an employee and speech made as a private citizen, noting that "when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes." *Lane*, 573 U.S. at ---, 134 S.Ct. at 2376 (quoting *Garcetti*, 547 U.S. at 421). "The critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Id.* at 2379; *see Monz v. Rocky Point Fire Dist.*, 519 F. App'x 724, 727 (2d Cir. 2013)

(holding that expressions made pursuant to employee's official duties as captain of fire company were not constitutionally protected).

If the employee spoke as a private citizen, the court determines whether the employee spoke on a matter of public concern. *See Lane*, 573 U.S. at ---, 134 S.Ct. at 2380. "A matter of public concern is one that relates to any matter of political, social, or other concern to the community." *Spencer v. Philemy*, 540 F. App'x 69, 70 (2d Cir. 2013) (alteration and internal quotation marks omitted) (quoting *Singer*, 711 F.3d at 339). Courts must take into consideration the "content, form, and context" of the speech. *See Lane*, 573 U.S. at ---, 134 S.Ct. at 2380 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983)); *Singer*, 711 F.3d at 339 (quoting same). If speech is "merely 'calculated to redress personal grievances,'" it is not protected. *MacFall v. City of Rochester*, 495 F. App'x 158, 160–61 (2d Cir. 2012) (quoting *Ruotolo v. City of New York*, 514 F.3d 184, 189 (2d Cir. 2008)). Similarly, although courts may consider the employee's motive, any such motive is not dispositive of the issue. *Spencer*, 540 F. App'x at 70 ("The employee's motive for speaking 'surely may be one factor' in determining whether the speech was on a matter of public concern, but motive 'is not, standing alone, dispositive or conclusive.'" (quoting *Sousa v. Roque*, 578 F.3d 164, 175 (2d Cir. 2009))). "The fact that a statement was made to the employer in private is not determinative of whether its subject was a matter of public concern." *Jackler v. Byrne*, 658 F.3d 225, 235–36 (2d Cir. 2011) (citations omitted). The question of whether a public employee spoke on a matter of public concern is a question of law. *Id.* (citing *Singer*, 711 F.3d at 339).

### i. Plaintiff's inability to have union representation attend meetings

As an initial matter, Plaintiff has not identified the protected speech or conduct that she considers to have prompted Defendants' unconstitutional retaliation. The Complaint alleges

14

solely that Plaintiff was "rendered incapable of availing herself of union assistance due to [Defendants'] willful interference" with her First Amendment rights. (Compl. ¶ 98.) This allegation suggests that Plaintiff's First Amendment retaliation claim is based on: (1) her inability to have her UFT representative, Pietromonaco, present at the meeting with Mattera and Neis, where the parties discussed complaints against Plaintiff and her role in the school's lockdown drill, (*see id.* ¶ 82); and (2) her inability to "arrange for a representative of her choice to be present" for a medical examination ordered by the DOE, (*id.* ¶ 83).

Based on the Complaint, it is not clear whether Plaintiff alleges that Defendants retaliated against her *because* she attempted to have a union representative present for interactions with Defendants, or retaliated against her for other conduct by *preventing* her from having a union representative present for interactions with Defendants. If Plaintiff is alleging that she engaged in protected speech and Defendants retaliated against her when they prohibited her from having her union representative present, she has not identified the speech that prompted such retaliation. Conversely, if Plaintiff is alleging that she attempted to have her union representative present for meetings and that, as a result, Defendants retaliated against her, she has not identified the retaliatory action. In either scenario, however, Plaintiff has not stated a claim for First Amendment retaliation because she has not alleged that she engaged in protected speech and was retaliated against for engaging in that speech. *See Spencer*, 540 F. App'x at 70 (2d Cir. 2013) ("[T]he First Amendment protects a public employee from retaliation by his or her employer for the employee's speech only if 'the employee sp[eaks] [1] as a citizen [2] on a matter of public concern.'" (alterations in original) (quoting *Singer*, 711 F.3d at 339)).

### ii. Plaintiff's refusal of the Readers' Theater position and reporting of unlawful practices

In opposition to Defendants' motion to dismiss, Plaintiff provides two other bases for her

retaliation claim. Plaintiff first contends that the "retaliatory behavior began" when she "declin[ed] the Readers' Theater position," and then argues that she made "statements . . . regarding the unlawful practices of Defendants Mattera and Neis," which were "met with retaliatory action." (Pl. Opp'n 5.)

As stated in the Complaint, Plaintiff declined the Readers' Theater position because "she was very happy with teaching first grade and had no desire to make a change." (Compl. ¶ 13.) Accordingly, Plaintiff's refusal to accept the Readers' Theater position does not qualify as protected speech under the First Amendment because, as alleged, it was solely related to her personal interest as an employee. *See Garcia*, 706 F.3d at 129–30 ("[T]he plaintiff must show that . . . the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest . . . ." (citation and internal quotation marks omitted)).

Plaintiff's further argument, that she made "statements . . . regarding the unlawful practices of Defendants Mattera and Neis," which were "met with retaliatory action," (Pl. Opp'n 5), also fails to state a claim for First Amendment retaliation. Plaintiff argues that she was "not only concerned for herself, but also for all teachers subject to the wrath of corrupt and overpowering superiors such as Mattera and Neis." (*Id.*) "More important, Plaintiff was concerned about the children, who were repeatedly used as pawns in [] Defendants' maniacal schemes." (*Id.*)

"[C]orruption in a public program and misuse of state funds [] obviously involves a matter of significant public concern." *Lane*, 573 U.S. at ---, 134 S.Ct. at 2380; *see also Garcetti*, 547 U.S. at 425 ("Exposing governmental inefficiency and misconduct is a matter of considerable significance."). A plaintiff who reports public corruption and unlawful practices may be considered to have spoken on a matter of public concern under the First Amendment

even if she does so for personal reasons. *See Garcia*, 706 F.3d at 130 ("Whether or not [the plaintiff] held the press conference solely out of a desire to protect his reputation, he spoke about a matter of public concern, namely, whether the police department was discriminating against Hispanics."); *cf. Ezekwo v. N.Y.C. Health & Hosps. Corp.*, 940 F.2d 775, 781 (2d Cir. 1991) (holding that statements made by a medical resident airing her "personal dissatisfaction" with the competency of her residency program director were not subject to First Amendment protection by "the mere fact that one or two of [her] comments could be construed broadly to implicate matters of public concern").

The Complaint broadly and repeatedly alleges that Mattera and Neis were "corrupt" and "totalitarian" with respect to school administration generally, and that they operated P.S. 11 as an "insane asylum" and were "bent on revenge." (*See, e.g.*, Compl. ¶¶ 20–24, 27, 34, 38, 39.) Viewing the facts in Plaintiff's favor, Plaintiff reported to the UFT, and perhaps the superintendent,[11] that Defendants had retaliated against her for declining the Readers' Theater position by harassing her and intentionally providing sub-par year-end reviews of her teaching, in a "scheme to discontinue [P]laintiff's teaching license." (*See* Compl. ¶ 21.) Plaintiff appears also to have asked Baskin for advice in handling the "harassment" she was experiencing from Mattera and Neis, but states that Baskin was part of "widespread . . . corruption at DOE" and was "bribed to stay quiet" with promises of a different employment position. (*Id.* ¶ 23.) Although the Complaint suggests that Plaintiff endured harassment at the same time that the district and

---

[11] Plaintiff generally describes further meetings regarding her complaints against Mattera and Neis. In the first meeting, on October 12, 2011, Plaintiff met with Pietromonaco and the district superintendent to discuss her teaching license and her fear that it would be revoked. (*See* Compl. ¶ 34.) In the second meeting, on October 17, 2011, Plaintiff met with Mattera and the superintendent. (*Id.*) That discussion "did not focus on the problems that Mattera and Neis were giving to the plaintiff, but rather the discussion was a general one about education." (*Id.*)

UFT were conducting investigations into Mattera's behavior as the principal of P.S. 11, the Complaint does not state that Plaintiff engaged in speech related to a matter of public concern. (Pl. Opp'n 5.) Plaintiff appears to have spoken to Pietromonaco, and possibly the superintendent, about Defendants' vendetta to revoke her teaching license, (*see* Compl. ¶¶ 32–34), but Plaintiff does not allege that she spoke to anyone about the "widespread corruption" that she observed at P.S. 11. Plaintiff's speech regarding her own employment situation does not rise to the level of public concern. *See MacFall*, 495 F. App'x at 160–61 (noting that speech is not protected when it is "merely 'calculated to redress personal grievances'" (quoting *Ruotolo*, 514 F.3d at 189)). Because Plaintiff has not shown that "the speech at issue was made as a citizen on matters of public concern rather than as an employee on matters of personal interest," *Garcia*, 706 F.3d at 129–30, the Court dismisses Plaintiff's claim for retaliation under the First Amendment.

### d. Supplemental jurisdiction over state law claims

A district court may decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); *Alliance of Auto. Mfrs., Inc. v. Currey*, 610 F. App'x 10, 14 (2d Cir. 2015) (holding that it was "not improper for the court to decline to exercise its supplemental jurisdiction" after it properly dismissed the plaintiff's constitutional claims); *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994) ("[I]f the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." (alteration in original) (quoting *Castellano v. Bd. of Trustees*, 937 F.3d 752, 758 (2d Cir. 1991))).

Having dismissed Plaintiff's ADA and First Amendment retaliation claims, and without

diversity jurisdiction over the state law claims,[12] the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims for intentional infliction of emotional distress, breach of contract, defamation and prima facie tort. (*See* Compl. ¶¶ 101–116.) Plaintiff's state law claims are dismissed without prejudice.

### III. Conclusion

For the foregoing reasons, the Court grants Defendants' motion to dismiss.

SO ORDERED:

    s/ MKB
MARGO K. BRODIE
United States District Judge

Dated: November 3, 2016
      Brooklyn, New York

---

[12] Plaintiff and the DOE are residents of the State of New York. (Compl. ¶ 2.) *See Pa. Pub. Sch. Emps.' Ret. Sys. v. Morgan Stanley & Co.*, 772 F.3d 111, 117–18 (2d Cir.), *as amended*, (Nov. 12, 2014) ("Subject matter jurisdiction is based on 28 U.S.C. § 1332, which requires 'complete diversity,' *i.e.* all plaintiffs must be citizens of states diverse from those of all defendants." (citation omitted)).

19